**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CONNELLY CONSTRUCTION** | : | |
| **CORPORATION,** | : | |
| *Plaintiff,* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **TRAVELERS CASUALTY AND SURETY** | : | |
| **COMPANY OF AMERICA et al.,** | : | **No. 16-555** |
| *Defendants*. | : | |

# MEMORANDUM

PRATTER, J.                                                                                  JANUARY 2, 2018

## INTRODUCTION

Over the course of a Commonwealth prison facility construction project, a subcontractor executed a series of contracts, styled as releases and change orders, that purported to waive claims against the general contractor. Subsequently, the subcontractor sued the general contractor, claiming that it lost money on the project due to the general contractor's mismanagement.

The bench trial focused on two issues:

1. Whether the subcontractor waived any potential claims against the general contractor by signing the periodic releases and change orders; and

2. Even if so, whether statements made by the general contractor's employees waived the general contractor's claim to rely on the releases and change orders.

The Court concludes that the general contractor never waived its right to rely on the releases and change orders, which themselves bar the subcontractor from asserting certain claims against the general contractor.

**FINDINGS OF FACT**

After introducing the parties, the project, and the subcontract at issue, the Court summarizes the series of releases and change orders signed by the subcontractor. Last, the Court explains the courses of conduct of both the general contractor and the subcontractor as they relate to the question of waiver.

## I.    Background

### A.  Parties

Walsh Heery Joint Venture ("WHJV") is a joint venture comprised of Walsh Construction Company and Heery International.  Compl. ¶ 2; Ans. ¶ 2.

Travelers Casualty and Surety Company of America, Travelers Casualty and Surety Company, Fidelity and Deposit Company of Maryland, and Liberty Mutual Insurance Company are WHJV's sureties.  Compl. ¶ 30; Ans. ¶ 30.

Connelly Construction Corporation ("CCC") is a masonry contractor that has been in the business of public masonry construction work since 1982.  Tr. Day 1 (Connelly) at 20:19–21:3. CCC is a woman-owned business enterprise[1] in Pennsylvania and has held that certification since 2008/2009.  *Id.* at 62:1–6.  CCC had previously completed jobs on which it was required to submit monthly waivers.  Stip. of Uncontested Facts ¶ 7.

Rita Connelly is the President and 75% owner of CCC.  Tr. Day 1 (Connelly) at 20:16– 18.  She handles contracts, bonding, insurance, accounts payable, and payroll for CCC.  *Id.* at 61:21–25.  She is the senior person within CCC responsible for knowing what was in CCC's subcontract for this project.  *Id.* at 147:4–10.

John Pico is a 25% owner of CCC.  Tr. Day 2 (Pico) at 2:23–3:5.

---

[1]    This means that Connelly has been certified to be at least 51% owned, operated, and controlled on a daily basis by women.

### B.  The Project

This case arises out of the construction of a prison facility known as "SCI Phoenix" for the Commonwealth of Pennsylvania at the site of the Graterford prison in Montgomery County (the "Project").  Stip. of Uncontested Facts ¶ 1.

On February 6, 2012, WHJV entered into a written contract with the Department of General Services ("DGS"), an executive agency of the Commonwealth, to provide construction services in connection with the Project.  *Id.* ¶ 2.  Construction has been underway since 2013 at a contracted cost of approximately $350 million.  *Id.* ¶ 3.  The original construction completion date was extended by DGS to November 2, 2015.  Tr. Day 3 (Swain) at 33:25–34:5.

CCC was WHJV's masonry subcontractor on the Project.  Stip. of Uncontested Facts ¶ 4. CCC had previously completed contracts of equivalent size and dollar value as compared to the Project.  *Id.* ¶ 6.  CCC began working on the Project in August 2013.  Tr. Day 1 (Connelly) at 21:22–24.  CCC completed its work in May 2015.  *Id.* at 21:25–22:2.

### C.  The Subcontract Between WHJV and CCC

CCC received a written subcontract agreement from WHJV for the Project in February or March 2012.  Tr. Day 1 (Connelly) at 70:9–10.  Upon receipt, Ms. Connelly made a number of handwritten modifications to the subcontract form and sent the revised, or "marked up," copy back to WHJV.  *Id.* at 71:4–74:11; DX-9.[2]

WHJV did not agree to CCC's proposed changes.  *Compare* DX-9, *with* DX-8; Tr. Day 1 (Connelly) at 27:24–28:1.  Ms. Connelly read the final execution copy of the subcontract and was aware that her requested modifications were not incorporated into the final version of the subcontract before she signed it.  *Id.* at 146:19–147:3.

---

[2]     "PX-" and "DX-" refer to Plaintiff's Exhibits and Defendants' Exhibits, respectively.

According to Ms. Connelly, WHJV Project Manager Patrick Delaney assured her that her exclusions and revisions were still a part of the final subcontract and that they did not appear on the subcontract simply because WHJV was not allowed to mark up the watermarked document. *Id.* at 27:15–22; 75:14–18; 76:7–9. According to Ms. Connelly, Mr. Delaney further stated that Ms. Connelly should trust him and sign the subcontract as-is because WHJV was "not out to hurt" CCC. *Id.* at 76:9–10. In contrast, Mr. Delaney testified that he had no recollection of any meeting in which Ms. Connelly questioned why her revisions to the subcontract were not made. Tr. Day 1 (Delaney) at 164:24–165:3.

Ms. Connelly signed the written subcontract between WHJV and CCC on behalf of CCC. Stip. of Uncontested Facts ¶ 5; DX-8. CCC had an opportunity to consult with legal counsel prior to executing the subcontract. DX-8.

Among other provisions, the subcontract required CCC to provide monthly lien waivers and releases (the "releases") to WHJV as a condition for receiving payment. Stip. of Uncontested Facts ¶ 10. The specific monthly waiver and release forms required by WHJV, titled "Partial Waiver and Release of Claims for Payment – Conditional – Joint Venture" and "Partial Waiver and Release of Claims for Payment – Unconditional – Joint Venture," were attached as Exhibit 1 to the subcontract. *Id.* ¶ 11.

The subcontract itself provides that

> [t]he failure of either party hereto to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Agreement, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects further performance.

DX-8 at Section 13.2.

The subcontract also provides specific requirements by which CCC must provide notice to WHJV of any claim. DX-8 at Section 4.3. It states:

4

**4.3 Claims**. A "Claim" is a Subcontractor's demand or assertion seeking, as a matter of right, an increase in Subcontract Amount, an extension in the time for performance of Subcontractor's Work, coverage under an insurance policy related to the Project, or relief with respect to the terms of the Contract Documents. All Claims must be made by written notice to the Contractor at least one (1) week prior to the beginning of the Subcontractor's affected or additional work, or the date by which Contractor is obligated to give notice to the Owner with respect to such claim, or within one (1) week of the Subcontractor's first knowledge of the event, whichever shall first occur, otherwise, such claims shall be deemed waived. With respect to written notice required for a Claim, Subcontractor's written notice must be via letter, email or fax is not sufficient notice. Subcontractor expressly acknowledges and agrees that *the preceding notice requirements are a material term of this Subcontract, and are necessary for the Contractor to mitigate adverse consequences arising out of or related to the Subcontractor's Claim, and that the Contractor would be prejudiced if the notice requirements are not followed by the Subcontractor*. . . . (Emphasis added)

CCC did not request any modifications to the provisions of the subcontract addressing the monthly release requirement or the notice of claim provision. Tr. Day 1 (Connelly) at 28:2–16.

## II. The Releases

CCC previously worked on projects for which it was required to submit monthly waiver forms. Stip. of Uncontested Facts ¶ 7. It is not unusual for monthly waiver forms to be required on construction projects. *Id.* ¶ 8.

Ms. Connelly did not consult with anyone at CCC, neither did she consult with any attorney, about the legal meaning of the releases before signing the subcontract, nor on the multiple occasions that CCC executed the releases. Tr. Day 1 (Connelly) at 46:16–18.

Shortly after signing the subcontract, Ms. Connelly received an email from WHJV's office manager containing copies of the same release forms included with the subcontract, and advising CCC what steps needed to be taken on a monthly basis, including executing the release

forms, to receive payment. PX-13; Tr. Day 1 (Connelly) at 126:22–127:23. Ms. Connelly did not raise any contemporaneous concerns about the releases. *Id*. at 127:13–18.

Ms. Connelly had several conversations, by email and phone, with WHJV Project Engineers Pierre Bick and Sean Taylor, concerning the proper way to fill out the waivers. *Id.* at 36:19–37:20; PX-23; PX-24; PX-25. Ms. Connelly did not discuss the releases with anyone else at WHJV, including Patrick Delaney. Tr. Day 1 (Connelly) at 41:1–6; 41:21–25.

Starting on July 16, 2013 and regularly thereafter, Ms. Connelly, signed the releases, secured a notary's acknowledgment, and delivered them to WHJV. DX-10; Tr. Day 1 (Connelly) at 28:21–25. Each release expressly stated that CCC was "waiving and releasing" WHJV, its sureties, and others:

> from ***any and all suits, debts, demands, torts, charges, causes of action, and claims for payment*** including claims under the laws of the municipality, state or federal government relating to payment bonds . . . ***on account of, arising out of or relating in any way to the labor, services, material, fixtures, equipment, apparatus or machinery furnished by [CCC] on the above described Project*** from the beginning of time until the date [on which the document was signed] including extras.

DX-13-19; DX-21; DX-23-24; DX-26; DX-28; DX-30-31 (emphasis added). At the time of the July 16 release, CCC's start date had been delayed by almost nine months. Tr. Day 1 (Connelly) at 23:3–6; *id*. at 23:19–23. This nine-month delay is a significant component of CCC's claim in this case. *Id.* at 135:9–23.

CCC submitted no fewer than eighteen written releases. They were submitted on the following dates:

> July 16, 2013 (DX-10)
> February 4, 2014 (DX-13)
> February 18, 2014 (DX-14)
> April 14, 2014 (DX-15)
> May 5, 2014 (DX-16)
> June 11, 2014 (DX-17)

July 7, 2014 (DX-18)
July 25, 2014 (DX-19)
September 25, 2014 (DX-21)
November 3, 2014 (DX-23)
December 8, 2014 (DX-24)
January 9, 2015 (DX-25)
February 10, 2015 (DX-26)
March 13, 2015 (DX-27)
April 7, 2015 (DX-28)
May 15, 2015 (DX-30)
June 11, 2015 (DX-31)
September 4, 2015 (DX-32).

Tr. Day 1 (Connelly) at 28:21–25; 29:9–12; Stip. of Uncontested Facts ¶ 12.

CCC delivered to, and required signatures from, its own subcontractors and suppliers on the same form of monthly release. Tr. Day 1 (Connelly) at 149:9–18. None of CCC's subcontractors or suppliers asked CCC to interpret the releases, or raised any questions or concerns about what they were signing when they filled out the forms. *Id.* at 149:19–21.

WHJV accepted releases from other subcontractors who had either modified the release language in their own contracts with the Joint Venture to exclude certain claims, or who had attached addenda or side letters to their releases to expressly preserve claims. DX-50; DX-51; Tr. Day 3 (Swain) at 7:15–8:23. CCC presented no evidence that it ever modified, marked up, attached an addendum to, or sent a side letter with, any of the releases.

## III. The Change Orders

WHJV and CCC executed five change orders during the Project. DX-33–DX-37. Ms. Connelly objected to broad release language in the first change order. She did not object to the same release language in the next four change orders. Finally, she refused to sign a sixth change order because she understood that the release language — which was identical to the language in the prior change orders — would waive CCC's right to assert a pending claim.

### A. Change Order 1

Change Order 1 ("CO1") was executed on or about April 22, 2014. DX-33. Although CCC originally proposed a price of over $2.1 million for the work included in CO1, the final negotiated price was $1.6 million. DX-33; Tr. Day 1 (Connelly) at 47:17–24; 89:20–24; 91:5–11. Ms. Connelly voluntarily and knowingly signed CO1. *Id.* at 91:12–13.

The original draft of CO1 included the broad release language. DX-4. Ms. Connelly was unhappy about the approximately $500,000 difference between what CCC had requested and what CCC had agreed to, and therefore requested that WHJV agree to replace the broad release language in the original draft of CO1 with language that she drafted. Tr. Day 1 (Connelly) at 51:14–19. Ms. Connelly proposed the new language that she thought would preserve Connelly's right to pursue the $500,000 difference between CCC's original proposed price and the final negotiated price. *Id.* at 52:5–14. Around the time that CCC was negotiating CO1, Connelly met with Robert A. Korn, a construction attorney.[3] *Id.* at 24:7–24.

Ms. Connelly alleges that during the negotiation of CO1, in response to her complaint about the $500,000 difference between what she had requested and what she thought she had agreed to, Patrick Delaney told her to "trust [him]" and that he assured her that "you will be made whole at the end of the job." *Id.* at 91:5–11. The circumstances of the conversation, as related at trial by Ms. Connelly, are best understood as meaning that Mr. Delaney's alleged statement was limited to the context of the negotiations for the price of CO1. *Id.* at 91:5–11. Nothing in Ms. Connelly's testimony suggested that she thought the conversation, as she recounted it, related to anything other than her displeasure with the final negotiated amount of CO1. *Id.* at 90:1–18, 91:5–11.

---

[3] The official trial transcript mistakenly refers to Mr. Korn as Robert "Coyne." This was not Connelly's first meeting with attorneys concerning the Project.

**B. Change Orders 3 through 6**

Connelly also executed Change Orders 3 through 6, on the following dates:

a. Change Order 3 ("CO3") – September 24, 2014 (DX-34)

b. Change Order 4 ("CO4") – November 20, 2014 (DX-35)

c. Change Order 5 ("CO5") – March 19, 2015 (DX-36)

d. Change Order 6 ("CO6") – May 19, 2015 (DX-37)

Each of Change Orders 3, 4, 5 and 6 contained the following release language:

> The price increase associated with each individual change ("Change") listed in this Change Order and/or any time extension granted under this Change Order constitute ***full and final payment to the Subcontractor/Seller for all of its additional costs and time associated both with the Change and with any and all other events that have occurred***, whether or not a claim has been asserted by the Subcontractor/Seller based on any such event, from the date that the Subcontractor/Seller entered into the Subcontract/Purchase Order through the date of the execution of this Change Order. ***The Subcontractor's/Seller's costs and time extensions resolved through this Change Order include, without limitation, all of the Subcontractor's/Seller's known and unknown direct costs, indirect costs, delay costs, overhead costs, general and administrative expenses, profit, home office expenses and all of the Subcontractor's/Seller's other costs (direct, indirect and consequential, including but not limited to, impacts, changes/impacts to unchanged work, and ripple effects) and time on all other Subcontract/Purchase Order Work, whether or not such Subcontract/Purchase Order Work was changed by the Change or this Change Order.***

DX-34–DX-37 (emphasis added).

The plain meaning of this language waives all claims that had accrued prior to the date of the change order, including delay, disruption, and impact-type claims — in other words, the very claims CCC is asserting in this case. Compl. ¶¶ 24–25. CCC agreed to the terms of Change Orders 3 through 6 with the broad release language because the price it negotiated for each of those change orders reflected the full amount it had requested from WHJV. Tr. Day 1

(Connelly) at 52:5–19.  CCC presented no evidence about any communications between WHJV and CCC concerning the scope of the release language contained in Change Orders 3 through 6.

### C. Change Order 7

On November 18, 2015, WHJV presented Connelly with Change Order 7 for review and execution.  DX-38.  After receiving CO7, Ms. Connelly sent an email to Brian McGinty, who had replaced Mr. Delaney as WHJV's Senior Project Manager, and advised Mr. McGinty that she could not "sign it due to the conditions stated at the top of the Change Order" but instead would like to use the same language agreed to on the revised CO1.  DX–39.

When Mr. McGinty responded that the change order must include language "indicating issues are closed," Ms. Connelly responded that "I can't sign anything stating that all claims are resolved.  We have a claim coming within the next week to Walsh."  DX–39.

In other words, Ms. Connelly refused to sign CO7 because she understood that the proposed language — which was identical to the language in Change Orders 3 through 6 — would waive CCC's right to assert a claim.  Tr. Day 1 (Connelly) at 54:2–15; DX-39.  CO7 was never signed.  *Id.* at 53:1–4.

## IV.    CCC elected not to tell WHJV that it was losing money on the Project.

Like WHJV's work as a whole, CCC's work on the Project was delayed from the beginning.  Although CCC originally expected to be able to start its work no later than November 2012, it did not begin its work until August 2013, approximately nine months later.  Tr. Day 1 (Connelly) at 23:3-6; *id.* at 23:19–23.

Almost immediately upon starting in August 2013, CCC came to believe that the Project was "a problem."  Tr. Day 1 (Connelly) at 23:3–7; Tr. Day 2 (Pico) at 31:5–16.  CCC completed and submitted Daily Report forms, which identified delays and other problems, from August

2013 through May 2015. Tr. Day 2 (Pico) at 14:5–8; Tr. Day 3 (Swain) 14:24–15:18; PX-30. CCC deposited the completed Daily Reports in a basket in WHJV's job trailer following each job meeting and understood that they were supposed to be reviewed by WHJV. Tr. Day 2 (Pico) at 14:5–15.

After having been on the Project for only two days, CCC was forced to stop working for nearly three weeks. Tr. Day 1 (Connelly) at 23:6–7; Tr. Day 2 (Pico) at 15:14–24; Stip. of Uncontested Facts ¶ 9. Both the initial delay and the stop-work delay are part of CCC's claim in this case. Compl. ¶¶ 15–17. CCC did not submit a notice of claim according to the requirements of the subcontract for either of these delays. Tr. Day 1 (Connelly) at 134:14–135:8.

Shortly after being required to stop work, CCC contacted F. Warren Jacoby, a construction attorney at Cozen O'Connor, to seek advice about whether CCC could "get out of the contract" with WHJV. *Id.* at 23:8–14. Ms. Connelly testified that CCC contacted Mr. Jacoby because it "knew we would lose money" on the job because the Project "was delayed" and because of the "inefficiencies" that CCC had already experienced. *Id.* at 110:15–25.

CCC remained on the Project and did not submit any contractual notice of claim concerning these delays. *Id.* at 134:14–135:8. However, CCC's co-owner and project manager, John Pico, had concluded that CCC was already losing money in August 2013. Mr. Pico began taking detailed notes a week into the Project, in order to calculate how much money CCC was losing on the Project. Tr. Day 2 (Pico) at 31:23–32:5; *id.* at 33:7–14.

By October 2013, Mr. Pico had concluded that CCC had lost 167 working days and that its productivity was substantially less than what it had expected. *Id.* at 34:6–12. By April 11, 2014, Mr. Pico had concluded that CCC had lost approximately $646,000 on the job, which was "really struggling." *Id.* at 35:12–18. Around that time, Mr. Pico met with Ms. Connelly and

Joseph Connelly Sr. to discuss the problems on the job and concluded that CCC needed to micromanage the Project better.  *Id.* at 35:19–24.  CCC did not inform WHJV that it had lost $646,000 on the Project; instead, CCC decided to keep that information "in-house."  *Id.* at 35:25–36:20.

CCC finished its work on the Project by the end of May 2015.  Tr. Day 1 (Connelly) at 21:25–22:2.  All of CCC's claims in this case had occurred by then.  *Id.* at 22:3–7.  The latest release signed by Ms. Connelly on behalf of CCC is dated September 9, 2015.  DX-32.

CCC did not tell WHJV that it was suffering losses, or that it would attempt to recover those losses from WHJV, until December 2015, seven months after CCC left the job.  By that time, WHJV had no opportunity to "remedy, mitigate and/or address any of the issues" raised by CCC.  Tr. Day 3 (Swain) at 35:25–36:20.  Almost 80% ($2.6 million) of CCC's claim is for "impact costs," the very costs that CCC elected not to present to WHJV as they were being incurred.  Compl. ¶¶ 14–21; 24–26.

## V.    CCC requested (and WHJV provided) financial assistance.

On March 18, 2014, Ms. Connelly wrote to Patrick Delaney requesting that WHJV extend CCC's timeframe in a yet-to-be-issued schedule.  PX-45.  The letter recites that:

> If the duration for our work is shortened, and we need to have multiple crews on site, then we will need to discuss with you about compensation for additional costs that our company will incur and alternative payment arrangements to help with the significant increase with weekly payroll.  We also need to resolve the pending change orders.

The March 18 letter is not a notice of claim because it does not seek an increase in the subcontract amount or an extension of time for performance of the subcontractor's work.  Mr. Delaney testified it was his practice to have contractors call him or meet with him in person to

work out issues rather than send letters that he would have to sit and respond to, and this view is something he expressed to CCC. Tr. Day 1 (Delaney) at 156:9–22.

On April 8, 2014, CCC sent another letter detailing problems with the delayed start to construction. At the time, CCC had not determined whether the "delayed start of construction" referred to in the April 8 letter was going to be a claim or not. Tr. Day 1 (Connelly) at 138:13–139:1. The April 8 letter is not a notice of claim under the subcontract because it does not seek an increase in the subcontract amount or an extension of time for performance of subcontractor's work. *Cf.* DX-8 at Section 4.3.

Following the March 18 and April 8 letters, WHJV instructed CCC to increase its production, which required it to increase manpower. Tr. Day 1 (Connelly) at 96:11–17. CCC again told WHJV that it would be very burdensome for CCC to carry the payroll required to support the increased production. *Id.* at 97:7–11. To assist CCC in carrying the burden of the increased payroll, WHJV agreed to pay CCC biweekly rather than monthly. *Id.* at 97:11–15. WHJV also agreed to pay CCC regardless of whether WHJV had been paid by the Commonwealth. *Id.* at 156:25–157:6. WHJV also assisted CCC by purchasing certain materials and equipment for CCC, without charge. *Id.* at 97:11–19; Tr. Day 1 (D. Taylor) at 215:11–19.

Ms. Connelly advised WHJV personnel that CCC did not have the money to support the equipment to work in multiple areas. Tr. Day 1 (Delaney) at 174:19–175:3. As a result, WHJV agreed to pay directly to suppliers for items like plank, towmotors, and scaffolding that CCC needed for its work. *Id.* at 174:19–175:10; Tr. Day 1 (Taylor) at 217:9–19. This was done without revision to the subcontract or back-charging CCC for the expenses. Tr. Day 1 (Connelly) at 96:11–98:5.

In sum, WHJV's actions of paying CCC on a biweekly basis, regardless of whether payment was received from the Commonwealth, and of purchasing materials and equipment, responded to CCC's concerns in the March 18 and April 8 letters. *Id.* at 95:16–20; 97:7–13.

CONCLUSIONS OF LAW

On the basis of the Court's assessment of the credibility of the witnesses, the consistency (or lack thereof) of the testimonial and documentary evidence, and the precedential case law, the Court reaches four main conclusions of law, which are set forth below. First, the releases and change orders waived CCC's claims. Second, CCC knowingly and voluntarily waived its claims. Third, WHJV did not waive its right to rely on the releases and change orders. Fourth, CCC has not shown that WHJV had unclean hands.

**I.    The releases and change orders waived CCC's claims.**

WHJV has asserted the affirmative defenses of waiver and release on the basis of the monthly releases and Change Orders 3 through 6. Ans. ¶¶ 3–4. CCC's claims are barred by the releases and change orders.

To begin, the releases and change orders are contracts. Under Pennsylvania law, "a release is itself a contract." *First Gen. Const. Corp., Inc. v. Kasco Const. Co., Inc*., No. 10-CV-2655, 2011 WL 2038542, at *4 (E.D. Pa. May 24, 2011). "Construction lien waivers and releases are routinely enforced." *Bricklayers & Allied Craftworkers Local 1 of Pa/De v. ARB Construction, Inc*., No. 13-CV-3883, 2016 WL 1161528, at *5 (E.D. Pa. Mar. 23, 2016) (holding that the plain language of a release signed by subcontractor barred subcontractor's claims against general contractor); *see also Scandale Associated Builders & Engineers, Ltd.*, No. 4:03-CV-1773, 2007 WL 1074108, at *8–9 (M.D. Pa. Apr. 4, 2007) (holding that the release in a change order signed by subcontractor entitled general contractor to judgment as a matter of law on

14

subcontractor's claim for delay damages); *First General Const. Corp.*, 2011 WL 2038542, at *4–5 (granting general contractor summary judgment on grounds that release signed by subcontractor barred subcontractor's claims).

"[C]ommercial parties are free to contract as they desire." *Mellon Bank, N.A. v. Aetna Business Credit, Inc*., 619 F.2d 1001, 1009 (3d Cir. 1980). "Absent illegality, unconscionableness, fraud, duress, or mistake the parties are bound by the terms of their contract." *Id*. In other words, any "disadvantage" suffered if this Court "hold[s] [CCC] to its contractual obligations is one it bargained for in the contract. A deal is a deal is a deal, even when it causes the one who drove home the deal to be skewered by the ultimate result." *See Nova Ribbon Prod., Inc. v. Lincoln Ribbon, Inc*., No. 89-CV-4340, 1992 WL 211544, at *10 (E.D. Pa. Aug. 24, 1992); *see also Chambers Dev. Co. v. Passaic Cty. Utilities Auth.*, 62 F.3d 582, 589 (3d Cir. 1995) (quoting *Morta v. Korea Ins. Corp.*, 840 F.2d 1452, 1460 (9th Cir. 1988)) ("Freedom of contract includes the freedom to make a bad bargain. 'It is a fundamental principle of contract law, therefore, that, wise or not, a deal is a deal.'").

Or, as a Pennsylvania court once poetically put the matter:

> The trial court so learned was led to conclude
> that appellant only seeks to undo
> that which he wanted back in '84,
> a deal which clearly he fancies no more.
>
> But a deal is a deal, if fairly undertaken,
> and we find disclosure was fair and unshaken.
> Appellant may shun that made once upon a time,
> but his appeal must fail, lacking reason (if not rhyme).

*Busch v. Busch*, 732 A.2d 1274, 1278 (Pa. Super. Ct. 1999).

What was the "deal" struck here? To answer that question, the Court must enforce the ordinary meaning of the contract if its terms are clear and unambiguous. "Pennsylvania contract

law begins with the firmly settled point that the intent of the parties to a written contract is contained in the writing itself." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 92 (3d Cir. 2001) (citations and quotations omitted). "In Pennsylvania, it is well settled that the effect of a release is to be determined by the ordinary meaning of its language. . . . However improvident the release may be or subsequently prove to be for either party, their agreement, absent fraud, accident or mutual mistake, is the law of their case." *Taylor v. Solberg*, 778 A.2d 664, 667 (Pa. 2001); *see also M.P. v. Penn-Delco Sch. Dist.*, No. CV 15-2446, 2015 WL 7430010, at *5 (E.D. Pa. Nov. 20, 2015) ("We see no reason to look beyond the plain language of the Release in determining the intent of the contracting parties at the time they signed it. If it were otherwise, every release would be subject to attack whenever a contracting party has a change of heart.").

In this case, the form of the monthly release was set forth in the subcontract, which CCC freely and knowingly signed. The language of the releases is clear and unequivocal, and "unambiguously relinquishes all the claims that accrued against [WHJV] through" the date of the lien waiver. *Lydon Millwright Services, Inc. v. Ernest Bock & Sons, Inc.*, No. 11-CV-7009, 2013 WL 1890355, *5 (E.D. Pa. 2013) (Pratter, J.); *see also ILM Systems, Inc. v. Suffolk Const. Co., Inc.*, 252 F. Supp. 2d 151, 160 (E.D. Pa. 2002) (holding that subcontractor releases were unambiguous and barred delay damage claim); *G.R. Sponaugle & Sons, Inc. v. Hunt Const. Group, Inc.*, 366 F. Supp. 2d 236, 242 (M.D. Pa. 2004) (finding that subcontractor release barred its claim, and holding that where release language is clear and unambiguous, "the court looks no further than the language in interpreting the release").

There is simply no colorable argument that the release language is ambiguous. Pennsylvania district courts have consistently enforced language substantially similar to the

release language here by finding that the language was unambiguous. *See, e.g.*, *Bricklayers & Allied Craftworkers Local 1 of Pa/De*, 2016 WL 1161528, at *5; *First General*, 2011 WL 2038542, at *5; *Sauer Inc. v. Honeywell Bldg. Sols. SES Corp.*, 742 F. Supp. 2d 709, 719–20 (W.D. Pa. 2010); *Scandale Associated Builders & Engineers*, 2007 WL 1074108, at *8; *G.R. Sponaugle & Sons*, 366 F. Supp. 2d at 242–43; *ILM Sys.*, 252 F. Supp. 2d at 159.

The language of the change orders is likewise clear and unambiguous and releases all of CCC's claims accruing as of the date of each of Change Orders 3 through 6. All of the claims that CCC is asserting in this action accrued prior to May 19, 2015 (the date of CO6) and certainly by September 4, 2015 (the date of the last release signed by CCC).

In sum, CCC clearly and unambiguously waived its claims against WHJV by signing the releases and change orders.[4] Therefore, unless some rule of law precludes WHJV from relying on the releases and change orders, CCC's claims (other than its claim for unpaid retainage which is not yet due) are barred. The final three sections of this memorandum reject each of CCC's proposed reasons why WHJV cannot rely on the releases and change orders.

---

[4] CCC argues that Ms. Connelly objected to language in the subcontract that gave rise to these releases and change orders, and that she signed the subcontract only because Patrick Delaney provides that WHJV was "not out to hurt" CCC.

For three reasons, the Court is skeptical of Ms. Connelly's protestations. First, it is not clear whether Mr. Delaney's alleged statement is excluded from hearsay as a statement of an opposing party, because it is not clear whether Mr. Delaney was "a person whom [WHJV] authorized to make a statement on the subject." *See* FED. R. EVID. 801(d)(2)(C). Second, Pennsylvania's parol evidence rule bars this Court from considering any prior or contemporaneous statements made by WHJV employees concerning the subcontract. *See Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 995 (3d Cir. 1987). Third, CCC represented that it is pursuing a waiver theory, not a fraudulent inducement theory. The Court cannot discern how pre-execution statements or conduct can support an argument that a party waived its rights under a contract executed later in time.

In any event, even if CCC could clear these three potential hurdles, the Court finds that CCC still clearly and unambiguously waived its claims against WHJV by signing the releases and change orders. Given all of this, as well as Ms. Connelly's stated experience in the construction industry, her at-trial arguments that she ignored all of that in the face of a virtual stranger's supposed invitation to "trust me" is simply not persuasive.

## II.    CCC knowingly and voluntarily waived its claims.

CCC argues that Ms. Connelly did not act knowingly and voluntarily when she signed the releases and change orders.  The Court disagrees.

CCC claims that Mr. Bick and Mr. Taylor made various representations about the meaning of the releases.  Even if those statements were made, they would not aid CCC in avoiding the effects of the releases.  "In the absence of fraud or a relation of trust and confidence between the parties, a releasor can ordinarily not avoid the effect of a release upon the ground that at the time he signed the paper he did not read it or know its contents, but relied on what another said about it."  *Seaton v. East Windsor Speedway, Inc*., 582 A.2d 1380, 1383 (Pa. Super. 1990) (citations omitted).

CCC presented no evidence of fraud attendant to the releases, or any evidence of a fiduciary relationship between CCC and WHJV.  Likewise, CCC presented no evidence showing any lack of knowledge or voluntariness in Ms. Connelly's execution of Change Orders 3 through 6.  To the contrary, Ms. Connelly testified that she executed those change orders because the price of each change order reflected the full amount that it had requested for each one.  Tr. Day 1 (Connelly) at 52:5–19.

Ms. Connelly understood that the broad release language contained in the draft of CO1, DX-4, would bar CCC's right to bring a claim in the future.  Nevertheless, she knowingly signed Change Orders 3 through 6 containing that same language.  Ms. Connelly's knowledge and understanding of the effect of the release language in those change orders is further demonstrated by her refusal to sign CO7 on the grounds that doing so would bar the claim CCC was about to submit.  By attempting to modify the language the language of CO7, Ms. Connelly "implicitly acknowledged that the unaltered release language had contemplated a waiver of the very claims

that it was seeking to pursue." *Sauer*, 742 F. Supp. 2d at 719 (holding that subcontractor's subsequent attempt to modify release language demonstrated that the subcontractor understood that the same language in previously-executed releases would bar claims for delay damages).

Therefore, CCC executed a knowing and voluntary waiver of its rights.

## III.    WHJV did not waive its right to rely on the releases and change orders.

CCC argues that the statements and conduct of WHJV employees waived WHJV's right to rely on the releases and change orders.  The Court disagrees.

### 1.    Burden of Proof

In order to establish that WHJV waived — or is estopped to enforce — its right to rely on the releases and change orders, CCC must meet a clear and convincing burden of proof.  *See, e.g.*, *J.E. Mamiye & Sons v. Fidelity Bank,* 813 F.2d 610, 617 (3d Cir. 1987) (estoppel); *Charter Oak Ins. Co. v. Maglio Fresh Food*, 979 F. Supp. 2d 581, 596 (E.D. Pa. 2013) (waiver).

"To constitute a waiver of legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it . . . .  In short, the doctrine of implied waiver in Pennsylvania applies only to situations involving circumstances equivalent to an estoppel, and the person claiming the waiver to prevail must show *that he was misled and prejudiced thereby*."  *Brown v. City of Pitt.,* 186 A.2d 399, 401 (Pa. 1962).  Waiver must be proven by either an "express declaration" of an intent to waive a party's rights, or "a party's undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary."  *Lydon Millwright Services*, 2013 WL 1890355, at *6 (citation omitted).

CCC has not satisfied this heavy burden.

### 2.  **WHJV did not relinquish its right to rely on the releases.**

The essence of CCC's waiver/estoppel defense is that WHJV employees told CCC that the releases did not waive CCC's claims.  Tr. Day 1 (Connelly) at 34:9–21.  CCC's position amounts to an allegation of "express declaration" of waiver.  *See Lydon,* 2013 WL 1890355, at *6.

CCC's limited evidence on this point does not prove by clear and convincing evidence that WHJV personnel made an express declaration of waiver.  Ms. Connelly admitted that she did not have any discussion with anyone at WHJV about whether the releases waived any specific claims that CCC might have against WHJV or whether the releases waived delay or disruption claims that CCC might want to assert later.

At most, CCC's evidence shows that Ms. Connelly was confused by the forms of the waivers, including the difference between conditional and unconditional waivers, and what dollar amounts needed to be inserted into each form, and that Mr. Bick and Mr. Taylor — who were entry-level employees — explained to her that the monthly waivers were effective "up to the amount paid."  Tr. Day 1 (Connelly) at 33:20–24; 37:6–20.  Even if Ms. Connelly's testimony was credited on this point, this evidence does not constitute clear and convincing evidence of either an "express declaration" of an intent not to rely on the waiver forms, or of WHJV's "'clear, unequivocal and decisive act' that evidences a 'purpose to surrender'" WHJV's rights under the releases and change orders.  *Lydon*, 2013 WL 1890355, at *6 (quoting *Brown,* 186 A.2d at 401).

Although the principal target of CCC's trial presentation was WHJV's former project manager Patrick Delaney, Ms. Connelly conceded that she never discussed the meaning or effect

of the releases with Mr. Delaney, or with anyone at WHJV other than Mr. Bick and Mr. Taylor.[5]
Accordingly, there is no waiver or estoppel arising out of Ms. Connelly's interactions with Pierre
Bick or Shawn Taylor.

### 3. WHJV did not waive its right to rely on the change orders.

In addition to the monthly releases, however, CCC's claims are also barred by the broad
release language in Change Orders 3 through 6. Like the releases, the change orders are
contracts and are governed by the same legal principles set forth above. The language of these
change orders, on their face, clearly and unambiguously released any claims existing as of the
date of the change order. DX-34–DX-37.

At trial, CCC presented no evidence to support its contention that WHJV waived, or is
estopped from relying upon, Change Orders 3 through 6. CCC presented no evidence bearing on
the release language contained in Change Orders 3 through 6, or on WHJV's alleged waiver of
that language.

The only evidence presented that arguably addressed waiver of the change orders was
Ms. Connelly's testimony that Mr. Delaney told her that he would try to "make her whole" while
they were negotiating the price of Change Order No. 1. Tr. Day 1 (Connelly) at 91:9–11. This
statement, which Mr. Delaney did not recall making, related only to the $500,000 difference
between what CCC had requested and what it ultimately agreed to. It is, at best, a vague and
ambiguous promise to try to help CCC out in the future. It does not constitute either an express
declaration of an intent to waive reliance on the release language that appeared in subsequent
change orders, or rise to the level of "undisputed" or "unequivocal and decisive" act or language
that leaves "no opportunity for a reasonable inference" that WHJV did not intend to waive its

---

[5]     Ms. Connelly did testify that WHJV Project Engineer Steve Molk sometimes asked her if
she had submitted her monthly waivers in connection with her payment requests. Tr. Day 1
(Connelly) at 37:21–38:1; *see also* footnote 4, *supra*.

rights.  *See Lydon Millwright Services*, 2013 WL 1890355, at *6 (quotations omitted); *Brown*, 186 A.2d at 401.  Once again, the Court also notes the inherently problematic nature of Ms. Connelly's description of her consideration of what she testified Mr. Delaney said.

Moreover, regardless of CCC's original "ask" of $2.1 million for CO1, it agreed to a price of $1.6 million after arms-length negotiations with WHJV.  Whatever Ms. Connelly's subjective desires, intent, or understanding with respect to recovering the $500,000 reduction that flowed from the negotiations, the plain and unambiguous language of CO1 — which was proposed by Ms. Connelly and fully incorporated by WHJV into the document — unambiguously precludes any renegotiation of that amount:

> The price adjustments (if any) and time extensions (if any) granted under this Change Order constitute full and final compensation to the Subcontractor only for the Subcontractor's claim for additional payment and an extension of time to perform the specific work covered by this Change Order.

DX-33.

CCC presented no other evidence of any manifestation by WHJV that it did not intend to rely upon the broad release language of each of the change orders.  Therefore, CCC has failed to satisfy its burden of proving that WHJV waived or is estopped from relying upon the monthly releases or the change orders.

## IV.   CCC has not shown that WHJV had "unclean hands."

CCC has also asserted an "unclean hands" affirmative defense.  Although the doctrine of unclean hands is equitable in nature, some courts have allowed its use as a defense to contract enforcement.[6]

---

[6]   WHJV does not concede (and the Court does not conclude) that it is appropriate to apply unclean hands as a defense to the enforcement of the Releases or change orders in this case.  Nevertheless, it may be instructive to address the merits of the argument.  The courts that have permitted the doctrine's use rationalize that in asking a court to enforce a waiver provision, a

The burden — both evidentiary and substantive — on a party seeking to employ the doctrine is extremely high. Even when applicable, the doctrine of unclean hands is subject to a clear and convincing evidentiary standard. "[C]ourts require clear, convincing evidence of 'egregious' misconduct before invoking the doctrine of unclean hands." *Citizens Financial Group, Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 129 (3d Cir. 2004) (quoting *Ciba-Geigy Corp. v. Bolar Pharm. Co., Inc.*, 747 F.2d 844, 855 (3d Cir. 1984)).

Moreover, the allegedly improper conduct must have occurred "in the very controversy" at hand, and the party against whom the doctrine is being employed must have "so conducted himself as to shock the moral sensibilities of the judge." *Gaudiosi v. Mellon*, 269 F.2d 873, 881 (3d Cir. 1959) (quoting *Art Metal Works v. Abraham & Straus*, 70 F.2d 641, 646 (2d Cir. 1934) (Hand, J.)). More recently, this Court has reaffirmed the requirement of a close nexus between the "unclean hands" and the specific issue in dispute:

> [C]ourts do not apply the unclean hands doctrine just because plaintiffs have engaged in some inequitable conduct; rather, the inequitable conduct identified by the defendant must evince a very close nexus to the defendant's own misconduct that initially gave rise to the suit.

*Merisant Co. v. McNeil Nutritionals, LLC*, 515 F. Supp. 2d 509, 531 (E.D. Pa. 2007) (quoting *Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F. Supp. 2d 594, 610 (D.N.J. 2003)).

Applying that doctrine to the facts of this case, CCC has not met its burden to establish an unclean hands defense. The "nexus" requirement dictates that the allegedly improper conduct

---

party is asking the court to grant specific performance, thus bringing equity principles into a contract case. *See, e.g.*, *Romero v. Allstate Ins. Co.*, 52 F. Supp. 3d 715, 735 (E.D. Pa. 2014). To test the validity of that rationalization, consider whether a party: (i) moving to have dismissed a contract claim brought twenty months after a project was completed, (ii) on the basis that the contract being sued on contained a clause that provided "all claims must be brought within 1 year of substantial completion" was, in so moving, invoking equity, or merely hoping to escape by some means the clarity of contract expression.

must have taken place with respect to the execution of the waivers and change order documents, rather than in the context of WHJV's relationship with CCC writ large.

Finally, in deference to the ultimate environment of equity, the Court notes that CCC presented no evidence at trial that would have "shocked the moral sensibilities" of any court, or otherwise constituted "egregious misconduct," whether directed to the waivers and releases or even more generally regarding the Project as a whole. The conduct that CCC addressed at trial — hard-nosed negotiation of change orders and the contract, vague promises to "work things out" later in the Project, and even sharp language, arguments, and threats to move to enforce a bond — could well be said to be par for the course in the construction industry, and is hardly evidence of the sort of "egregious misconduct" that "shocks the conscience" sufficient to support an unclean hands defense. There was no evidence that WHJV engaged in any questionable conduct relating to the execution of the releases or change orders.

To the contrary, the evidence showed that WHJV accommodated and assisted CCC in many ways: it agreed to Ms. Connelly's requested modification of the language of CO1; it paid CCC in advance of being paid by the Commonwealth in order to help CCC meet its payroll obligations; and it procured materials and equipment for CCC at its own cost. This is not evidence of "egregious misconduct."

For the foregoing reasons, the Court finds in favor of the defendants' on the question of the effect of the releases and change orders and finds that WHJV did not waive its reliance on the releases and change orders.  An appropriate order follows.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE