**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CONNELLY CONSTRUCTION** | : | |
| **CORPORATION,** | : | |
| *Plaintiff,* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **TRAVELERS CASUALTY AND SURETY** | : | |
| **COMPANY OF AMERICA et al.,** | : | **No. 16-555** |
| *Defendants.* | : | |

## M E M O R A N D U M

PRATTER, J.                                                                                          MAY 2, 2018

### INTRODUCTION

Walsh Heery Joint Venture ("WHJV") was a general contractor retained for construction work on a new prison facility in Montgomery County. WHJV hired subcontractor Connelly Construction Corp. ("CCC") to perform masonry work on the facility.

Over the course of the construction project, CCC executed a series of contracts, styled as releases and change orders, that purported to waive claims against WHJV. Subsequently, CCC sued WHJV, claiming that it lost money on the project due to WHJV's mismanagement.

In July 2017, the Court held a three-day bench trial on a subset of CCC's claims. In January 2018, the Court issued findings of fact and reached two conclusions of law:

1. Subcontractor CCC waived any potential claims against general contractor WHJV by signing the periodic releases and change orders; and

2. Statements and action by WHJV's employees did not waive WHJV's ability to rely on the releases and change orders.

Now, subcontractor CCC brings this motion for reconsideration or, in the alternative, for an interlocutory appeal. For the reasons outlined in this Memorandum, the Court denies the motion.

1

BACKGROUND

The Court's January 2, 2018 Memorandum containing Findings of Fact and Conclusions of Law provides a thorough summary of the facts. *See* Mem., Doc. No. 77, at 2–14. For purposes of this Memorandum, the Court will briefly highlight the facts most favorable to each side.

## I. Facts Favorable to CCC

CCC's preferred legal conclusions are that the release language does not bar its claims against WHJV and that WHJV waived the ability to rely on the release language. The two factual circumstances that CCC believes should lead to these legal conclusions are (1) statements and (2) conduct by WHJV employees.

**A. WHJV's Statements.** CCC submitted evidence that, over the course of the construction project, WHJV employees generally made assurances to Rita Connelly, the President of CCC, about the state of the project. The gist of the alleged assurances was that Ms. Connelly should "trust" WHJV, that WHJV would not "hurt" CCC, and that the parties would "work out" their differences. *See, e.g.*, Mem., Doc. No. 77, at 4, 8, 13, 17 n.4.

**B. WHJV's Conduct.** CCC submitted evidence that, over the course of the construction project, WHJV did not consistently enforce the release language against CCC and other subcontractors. *E.g.*, Mem., Doc. No. 77, at 12–14. Instead, WHJV sometimes sought to accommodate the needs of its subcontractors rather than hold their feet to the fire.

## II. Fact Favorable to WHJV

WHJV's preferred legal conclusion, with which the Court agrees, is that the release language, negotiated at arms' length by sophisticated and experienced parties, straightforwardly operates to bar CCC's claims. Two primary circumstances lead to this conclusion: (1) CCC's

general experience and sophistication and (2) the plain language of the releases and change orders.

**A. CCC's Sophistication.**  Ms. Connelly had decades of experience in the construction industry.  She negotiated the change orders and releases at arm's length.  She understood the legal effect of the release language.  In fact, she refused to sign one change order precisely because she knew that CCC was about to bring a claim against WHJV.  *See* Mem., Doc. No. 77, at 10.

**B. Contract Language.**  The specific terms of the releases, change orders, and notice provision are reproduced in the analysis section on this Memorandum.  In brief, even CCC seems to agree that the plain language of these contractual terms precludes its claims.  CCC's entire case, in other words, rests on identifying factual circumstances and legal rules to help CCC *escape* the plain meaning of the contractual terms.

### ANALYSIS OF MOTION FOR RECONSIDERATION

"A judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available previously; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice."  *Tomasso v. Boeing Co.*, No. 03-CV-4220, 2007 WL 2458557, at *1 (E.D. Pa. Aug. 24, 2007) (citing *Max's Seafood Cafe ex rel. Lou–Ann, Inc. v. Quinteros,* 176 F.3d 669, 677 (3d Cir. 1999)).

Here, only the third ground for reconsideration — a clear error of law — is at issue.  CCC has identified five conclusions by the Court that it argues were clear errors of law:

1. **Contract Meaning:**  The plain meaning of the releases and change orders operates to waive CCC's claims.

2. **Contract Formation:** CCC waived its claims by knowingly and voluntarily agreeing to the release language.

3. **Waiver:** Statements and actions by WHJV employees did not relinquish WHJV's right to rely on the releases and change orders.

4. **Notice:** CCC's requests for extensions of deadlines during the project did not amount to notices that CCC was asserting a claim against WHJV.

5. **Hearsay and Parol Evidence:** Testimony about statements by WHJV employee Patrick Delaney to CCC is inadmissible as hearsay and parol evidence.

Each conclusion is analyzed in turn. For the reasons that follow, the Court rejects CCC's arguments and denies the motion for reconsideration.

One criticism permeates CCC's motion and bears addressing at the outset: CCC insists that the Court overlooked certain evidence, presented at trial, concerning the parties' conduct. But the bare fact that the Court's prior Memorandum did not mention a given piece of evidence or testimony should not be taken to mean that the Court, as factfinder, did not consider it.

## I. Contract Meaning: The plain meaning of the releases and change orders operates to waive CCC's claims.

In its prior Memorandum, the Court concluded that CCC "clearly and unambiguously waived its claims against WHJV by signing the releases and change orders" because the terms of those documents were "clear and unambiguous." Mem., Doc. No. 77, at 17. CCC argues that the Court erred in reaching this conclusion without considering the effect of WHJV's *conduct* on the clarity of the terms in the releases and change orders.

Each release expressly stated that CCC was "waiving and releasing" WHJV, its sureties, and others:

> from ***any and all suits, debts, demands, torts, charges, causes of action, and claims for payment*** including claims under the laws of the municipality, state or federal government relating to payment bonds . . . ***on account of, arising out of or relating in any way to the labor, services, material, fixtures, equipment, apparatus or machinery furnished by [CCC] on the above described Project***

4

from the beginning of time until the date [on which the document was signed] including extras.

DX-13-19; DX-21; DX-23-24; DX-26; DX-28; DX-30-31 (emphasis added). Each of Change Orders 3, 4, 5 and 6 contained the following release language:

> The price increase associated with each individual change ("Change") listed in this Change Order and/or any time extension granted under this Change Order constitute ***full and final payment to the Subcontractor/Seller for all of its additional costs and time associated both with the Change and with any and all other events that have occurred***, whether or not a claim has been asserted by the Subcontractor/Seller based on any such event, from the date that the Subcontractor/Seller entered into the Subcontract/Purchase Order through the date of the execution of this Change Order. ***The Subcontractor's/Seller's costs and time extensions resolved through this Change Order include, without limitation, all of the Subcontractor's/Seller's known and unknown direct costs, indirect costs, delay costs, overhead costs, general and administrative expenses, profit, home office expenses and all of the Subcontractor's/Seller's other costs (direct, indirect and consequential, including but not limited to, impacts, changes/impacts to unchanged work, and ripple effects) and time on all other Subcontract/Purchase Order Work, whether or not such Subcontract/Purchase Order Work was changed by the Change or this Change Order***.

DX-34–DX-37 (emphasis added).

In the prior Memorandum, the Court concluded that "[t]here is simply no colorable argument that the release language is ambiguous. Pennsylvania district courts have consistently enforced language substantially similar to the release language here by finding that the language was unambiguous." Mem., Doc. No. 77, at 16–17. The same was true of the change orders. *Id.*

This section (1) summarizes CCC's argument, (2) explains why CCC's proposed course-of-conduct rule is incorrect, and (3) concludes that, even under CCC's proposed rule, the outcome would be the same.

## A. CCC's Argument

CCC argues that the Court failed to apply a rule articulated in a court of appeals decision that "to decide whether a contract is ambiguous," a court must look not only to "the language" in the contract, but also to "extrinsic evidence" such as "the conduct of the parties that reflects their understanding of the contract's meaning." *Bethlehem Steel Corp. v. United States*, 270 F.3d 135, 139 (3d Cir. 2001) (quoting *Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993)); *see also United States for the Use of Pioneer Const. Co. Inc. v. Pride Enterprises, Inc.*, No. 07-CV-0994, 2009 WL 4429802, at *6 (M.D. Pa. Nov. 27, 2009) ("There is authority for considering course of conduct in interpreting a contract.") (citations omitted).

Had the Court considered WHJV's course of conduct, CCC contends, the Court would have reached a different conclusion as to the meaning of the releases and change orders. In short, WHJV sometimes enforced the waiver language in the monthly releases, but sometimes it did not. To CCC, this course of conduct means that the very terms of the releases and change orders should be altered. As CCC puts it, WHJV behaved "in a manner so inconsistent with an intent to rely on" the plain meaning of the release language that WHJV "created an ambiguity in the documents themselves despite their plain meaning."

## B. CCC's Proposed Rule is Incorrect

For three reasons, CCC has proposed the wrong legal standard.

**First**, *Bethlehem Steel* gave arguably contradictory guidance as to when a court may consider extrinsic evidence. In CCC's favored passage, the *Bethlehem Steel* court blesses the use of extrinsic evidence as a threshold matter — that is, to decide whether a contract is clear in the first place. *See Bethlehem Steel Corp.*, 270 F.3d at 139 (explaining that, "to decide whether a

contract is ambiguous," a court should consider "extrinsic evidence"). Yet, earlier in the same paragraph, the court stated that extrinsic evidence only comes into play *after* a court has already decided that a contract is ambiguous. *See id.* (A court "may use extrinsic evidence to clarify the meaning of an ambiguous contract."). Given that the plain language of the releases and change orders is clear, the divergence in the *Bethlehem Steel* rule statements makes all the difference. *Bethlehem Steel* helps CCC only if it allows CCC to use extrinsic evidence to muddy waters that are already crystal clear.

**Second**, this Court has expressed deep skepticism about both CCC's interpretation and invocation of *Bethlehem Steel* and the underpinning of *Pioneer*. In 2013, this Court dismissed a litigant's reliance on both cases: *Bethlehem Steel* was off the mark because it "was decided under federal contract law rather than Pennsylvania law," and *Pioneer* "relied on *Bethlehem* without discussing" the proper Pennsylvania standard. *Lydon Millwright Servs., Inc. v. Ernest Bock & Sons, Inc.*, No. 11-CV-7009, 2013 WL 1890355, at *5 n.4 (E.D. Pa. May 7, 2013) (Pratter, J.).

**Third**, like *Pioneer*, CCC has missed the proper Pennsylvania standard. In *Lydon*, this Court explained that the case that "authoritatively sets forth the law on this point is *Bohler–Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79 (3d Cir. 2001)." *Lydon*, 2013 WL 1890355, at *4.

The rule articulated in *Bohler–Uddeholm* was that extrinsic evidence may be considered only in narrow circumstances: "a contract that is unambiguous on its face must be interpreted according to the natural meaning of its terms, unless the contract contains a latent ambiguity, whereupon extrinsic evidence may be admitted to establish the correct interpretation." *Bohler–Uddeholm*, 247 F.3d at 96. Further, if a party believes that a contract contains a latent ambiguity justifying the use of extrinsic evidence, the party must cite a "contractual hook" — that is, "the

proffered extrinsic evidence must support an alternative meaning of a specific term or terms contained in the contract, rather than simply support a general claim that the parties meant something other than what the contract says on its face." *Id.*

CCC has not identified any such "contractual hook." In fact, CCC seeks to do precisely what *Bohler–Uddeholm* prohibits: advance a "general claim that the parties meant something other than what the contract says on its face." To CCC, the releases and change orders reproduced above have no meaning at all.

In this respect, this case is identical to *Lydon*. There, as here, the plaintiff argued "extensively" that "the parties' conduct vis-à-vis each other" obviated clear release language. *Lydon*, 2013 WL 1890355, at *5. But there, as here, the plaintiff did not "identify a 'contractual hook' or proffer an alternative interpretation for the release language." *Id.* In both cases, then, the outcome is the same: "*Bohler–Uddeholm* precludes the Court from considering [the plaintiff's] extrinsic evidence in order to ignore the plain language of the release." *Id.*

### C. Even Under CCC's Proposed Rule, the Outcome Is the Same

Even under CCC's preferred standard as it claims was articulated in *Pioneer* and *Bethlehem Steel*, WHJV's course of conduct does not change the plain meaning of the contract.

*Pioneer* merely concluded that a factfinder *could* decide that the parties' conduct changed the meaning of the release language, not that a factfinder *must* do so. *See Pioneer*, 2009 WL 4429802, at *7 (noting that the defendants' "course of conduct supports an inference that the parties intended to disregard the release terms" and concluding that "[t]here is thus a question of fact pertaining to the interpretation of the partial releases"). Of course, that familiar summary-judgment standard is not at issue here. Instead, a factfinder — the Court — has already

considered and rejected the inference that WHJV's conduct altered the clear meaning of the release language.

The Court, as factfinder, was unmoved by CCC's arguments concerning WHJV's conduct for a simple reason: a party's occasional choice not to enforce a contractual term does not mean that the term ceases to exist. As a matter of sound "one-off" business practice, WHJV occasionally disregarded release language in an effort to "support" its subcontractors. *See* Tr. Day 3 (Swain) at 10:17–11:7. In this case, efforts to accommodate a business partner did not alter the meaning of a contract.

**II.** **Contract Formation: CCC waived its claims by knowingly and voluntarily agreeing to the release language.**

In the prior Memorandum, this Court concluded that CCC "executed a knowing and voluntary waiver of its rights" when it signed the releases and change orders. Mem., Doc. No. 77, at 19. In so concluding, the Court cited the rule that "[i]n the absence of fraud or a relation of trust and confidence between the parties, a releasor can ordinarily not avoid the effect of a release upon the ground that at the time he signed the paper he did not read it or know its contents, but relied on what another said about it." *Seaton v. East Windsor Speedway, Inc*., 582 A.2d 1380, 1383 (Pa. Super. 1990).

CCC argues that the Court committed two errors in this analysis. After dismissing CCC's two claimed errors, the Court explains why CCC's proposed alternative standard is incorrect.

**A. CCC's Proposed Errors**

CCC has identified two errors in the Court's analysis: (1) the Court's use of the rule from *Seaton*, and (2) a perceived limitation in the evidence the Court considered in making its "knowing and voluntary" conclusion.

First, CCC questions the Court's use of the rule from *Seaton*. Apparently, CCC believes that *Seaton* was a case about fraud in the inducement and therefore has no bearing on whether CCC's waiver was knowing and voluntary. But the term "fraud in the inducement" is nowhere to be found in *Seaton*. Instead, the case was partially about whether the plaintiff "knowingly and voluntarily signed the release" that he later wished to escape. *Id.* at 1383.

CCC's attempt to distinguish the facts of *Seaton* is likewise unconvincing. CCC correctly points out that the plaintiff in *Seaton* never read the contract that he knowingly and voluntarily signed, whereas Ms. Connelly did read (and understood) the release language that she signed on behalf of CCC. But CCC does not explain why this difference matters at all, let alone why it relates to whether CCC's waiver was knowing and voluntary. If anything, reading a contract ahead of time makes subsequent the act of signing it *more* knowing and voluntary, not less so.

CCC's second critique of the Court's "knowing and voluntary" conclusion is that the Court limited its written analysis to statements by WHJV employees Pierre Bick and Sean Taylor, ignoring "the actions of WHJV in their entirety that contradicted the waivers." To the contrary: the Court, as factfinder, considered all testimony and evidence in reaching its conclusion, including the parties' course of conduct. Just because certain testimony or evidence was not specifically mentioned in the Court's prior Memorandum does not mean that it was not taken into account.

Furthermore, CCC's reference to the totality of WHJV's actions is better suited to whether those actions altered the meaning of the release language (discussed above) or whether WHJV waived its ability to rely on the release language (discussed below). Reference to

*WHJV*'s conduct is less suited to the question of whether *CCC* knowingly and voluntarily agreed to the release language.

For that reason, to the extent WHJV's conduct factors into the "knowing and voluntary" analysis, the Court, as factfinder, severely discounts it. Ms. Connelly is a sophisticated businesswoman with decades of hands-on experience in the construction industry. She entered CCC into these contracts knowingly and voluntarily.

### B. CCC's Proposed Standard

In lieu of *Seaton*, CCC proposes standards from *Lydon* and *Brown v. City of Pittsburgh*, 186 A.2d 399 (Pa. 1962). In terms of usefulness for this case, both cases are dead on arrival: neither even mentions the question whether a party knowingly and voluntarily entered into a contract.

Instead, both cases articulate standards for evaluating a party's extra-contractual waiver of a preexisting right. "A waiver in law is the act of intentionally relinquishing or abandoning some known right, claim or privilege." *Brown*, 186 A.2d at 401. "To constitute a waiver of legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it." *Id.* "Waiver may be established by a party's express declaration or by a party's undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary." *Lydon*, 2013 WL 1890355, at *6 (quoting *Sabatini v. ITS Amore Corp.,* 455 F. App'x 251, 256 (3d Cir. 2011)).

CCC seeks to apply the *Lydon/Brown* standard in the wrong context. Ordinarily, these cases involve a party that holds a pre-existing right (usually in contract or tort) undertaking a

course of conduct that indicates an intent to waive that right. For instance, the question in *Lydon* was whether a party had, by its actions, waived its right to rely on a favorable contract term.

Here, by contrast, CCC has done something that sets it apart from any other case in the *Lydon*/*Brown* family: *CCC has signed contracts expressly waiving its rights*. To use language from the rule statements in *Lydon* and *Brown*, signing a waiver is undoubtedly a "clear, unequivocal, and decisive act" that evidences a "purpose to surrender" a right. Put another way, entering into a contract that releases one's claim is an "express declaration" of waiver.

"Ordinarily, the question of waiver is a question of fact for a jury." *Sabatini*, 455 F. App'x at 256. As factfinder, the Court was persuaded that CCC's signing of the release language represents and bespeaks an intent to waive its claims.

## III. Waiver: Statements and actions by WHJV employees did not relinquish WHJV's right to rely on the releases and change orders.

CCC argues that the Court did not appreciate the full sweep of WHJV's statements and conduct when the Court concluded that WHJV had not waived its right to rely on the releases and change orders. In CCC's view, the Court ignored the fact that WHJV sometimes enforced the waiver language in the monthly releases, but sometimes it did not. To CCC, this means that WHJV waived its ability to rely on the release language.

Once again, CCC seems to believe that the Court failed to consider certain evidence presented at trial simply because the evidence was not mentioned in the prior Memorandum. But the fact that a piece of evidence or testimony went *unmentioned* does not mean that it was *ignored* by the Court in its capacity as factfinder. In this case, out of sight does not mean out of mind.

Turning to the merits, the waiver rules impose a heavy burden on CCC, as explained above. "Waiver may be established by a party's express declaration or by a party's undisputed

acts or language so inconsistent with a purpose to stand on the contract provisions as to leave *no opportunity for a reasonable inference to the contrary*." *Sabatini,* 455 F. App'x at 256 (emphasis added); *see also Brown*, 186 A.2d at 401 (noting that waiver requires "a clear, unequivocal and decisive act" that evidences a "purpose to surrender" a right).

"Ordinarily, the question of waiver is a question of fact for a jury." *Sabatini,* 455 F. App'x at 256; *cf. Quinn Constr., Inc. v. Skanska USA Bldg., Inc.,* 730 F. Supp. 2d 401, 418 (E. D. Pa. 2010) (general contractor's practice of accommodating subcontractor created "a genuine issue of fact" as to whether the general contractor had waived enforcement of release language); *Lydon*, 2013 WL 1890355, at *7 (general contractor's promise to take care of subcontractor created issue of fact as to whether the general contractor "impliedly waived its right to rely on the releases").

As the factfinder, the Court stands by its original finding that CCC has failed to offer "clear and convincing evidence of either an 'express declaration' of an intent not to rely on the waiver forms [or change orders], or of WHJV's 'clear, unequivocal and decisive act' that evidences a 'purpose to surrender' WHJV's rights under the releases and change orders." Mem., Doc. No. 77, at 20. After assessing the witnesses and examining the evidence, including the testimony of Mr. Swain and the parties' course of conduct, the Court concluded that WHJV's statements and actions offering to accommodate CCC did not amount to a waiver. Nothing CCC argues now dissuades the Court of that conclusion.

## IV.    Notice:   CCC's requests for extensions of deadlines during the project did not amount to notices that CCC was asserting a claim against WHJV.

In the prior Memorandum, the Court considered whether CCC had given WHJV notice of its pending claims. *See* Mem., Doc. No. 77, at 12–14. The subcontract between CCC and

WHJV provides specific requirements by which CCC must provide notice to WHJV of any claim. DX-8 at Section 4.3. It states:

> **4.3 Claims**. A "Claim" is a Subcontractor's demand or assertion seeking, as a matter of right, an increase in Subcontract Amount, an extension in the time for performance of Subcontractor's Work, coverage under an insurance policy related to the Project, or relief with respect to the terms of the Contract Documents. All Claims must be made by written notice to the Contractor at least one (1) week prior to the beginning of the Subcontractor's affected or additional work, or the date by which Contractor is obligated to give notice to the Owner with respect to such claim, or within one (1) week of the Subcontractor's first knowledge of the event, whichever shall first occur, otherwise, such claims shall be deemed waived. With respect to written notice required for a Claim, Subcontractor's written notice must be via letter, email or fax is not sufficient notice. Subcontractor expressly acknowledges and agrees that ***the preceding notice requirements are a material term of this Subcontract, and are necessary for the Contractor to mitigate adverse consequences arising out of or related to the Subcontractor's Claim, and that the Contractor would be prejudiced if the notice requirements are not followed by the Subcontractor***. . . . (Emphasis added)

The initial Memorandum considered two letters from CCC to WHJV that potentially qualified as notices of claims. First, in a March 18, 2014 letter, Ms. Connelly requested an extension to CCC's schedule, writing:

> If the duration for our work is shortened, and we need to have multiple crews on site, then we will need to discuss with you about compensation for additional costs that our company will incur and alternative payment arrangements to help with the significant increase with weekly payroll. We also need to resolve the pending change orders.

Mem., Doc. No. 77, at 12.

As the Court concluded in January, this letter "is not a notice of claim because it does not seek an increase in the subcontract amount or an extension of time for performance of the subcontractor's work." Mem., Doc. No. 77, at 12.

Second, on April 8, 2014, CCC sent another letter detailing problems with the delayed start to construction. At the time, CCC had not determined whether the "delayed start of construction" referred to in the April 8 letter was going to be a claim or not. Tr. Day 1 (Connelly) at 138:13–139:1. Thus, the April letter was not a notice of claim either. Mem., Doc. No. 77, at 13.

Now, CCC takes issue with the Court's conclusions as to these two letters. In general, Pennsylvania law take a "lenient approach to construing notice provisions in construction contracts whereby the spirit of the provision, rather than the strict terms, dictates whether a contractor seeking compensation for a claim or claims complied with the contract's notice provisions." *First Gen. Const. Corp. v. Kasco Const. Co.*, No. 10-CV-2655, 2011 WL 2038542, at *7 (E.D. Pa. May 24, 2011) (citing *James Corp. v. North Allegheny School Dist.,* 938 A.2d 474, 486 (Commw. Ct. 2007)).

CCC argues that the two letters, combined with CCC's daily reports of problems on the project, amounted to sufficient notice to WHJV that CCC was unwilling to waive its claims. For four reasons, the Court disagrees.

**First**, the analysis in the Court's prior Memorandum still controls. In response to CCC's letters, WHJV offered assistance to CCC — which CCC accepted without bringing or reserving an articulated claim. Specifically, WHJV agreed "to pay CCC biweekly rather than monthly;" "to pay CCC regardless of whether WHJV had been paid by the Commonwealth;" to "assist[] CCC by purchasing certain materials and equipment for CCC, without charge;" and "to pay directly to suppliers for items like plank, towmotors, and scaffolding that CCC needed for its work." Mem., Doc. No. 77, at 13. Most importantly, all of this assistance was provided "without revision to the subcontract" and without any claim brought by CCC. *Id.*

**Second**, CCC continued to sign releases and change orders after sending the letters. This continued acquiescence to waiver language undercuts CCC's claim that it had notified WHJV of an impending claim. Indeed, once CCC truly had an impending claim, Ms. Connelly refused to sign the final change order in order to preserve that claim. Mem., Doc. No. 77, at 10. This behavior provided the Court, in its role as factfinder, ample evidence from which to conclude that the earlier letters were not notices of claims. As the facts around Change Order 7 demonstrate, Ms. Connelly knew how to properly assert a claim when her company actually needed to do so.

**Third**, WHJV Vice President Kevin Swain testified that CCC's December 2015 claim, filed long after its letters of March and April 2014, was out of the blue: "I had no notice of [the claim] from our project team prior to then." Tr. Day 3 (Swain) at 11:13–14. This impression is not surprising, given that the letters do not articulate a claim by CCC. Even though CCC has sought to characterize Mr. Swain's surprise as a self-inflicted wound — avoidable if Mr. Swain had only better communicated with Mr. Delaney — the Court, as factfinder, found Mr. Swain's testimony credible on this point.

**Fourth**, the lenient "actual notice" rule articulated in *First General* and *James Corp.* has a second part: actual notice will satisfy a contract's notice provisions "only if the defendant suffered no prejudice by the plaintiff's failure to submit a written claim." *First Gen. Const. Corp*, 2011 WL 2038542, at *7 (citing *James Corp.*, 938 A.2d 486–87). WHJV had no chance to help mitigate CCC's losses at the time CCC first suffered them. A construction project is a dynamic organism that cannot be reanimated after the fact. CCC has not given the Court enough reason to overturn the Court's prior conclusions about the effect of the March and April 2014 letters.

**V.     Hearsay and Parol Evidence:    Evidence of Mr. Delaney's statements, even if admissible, do not change the Court's findings.**

CCC argued at trial that Ms. Connelly only signed the release language because Patrick Delaney, a WHJV representative, promised her that WHJV was "not out to hurt" CCC.  Mem., Doc. No. 77, at 4.

In a footnote to its prior Memorandum, the Court offered three reasons to be "skeptical of Ms. Connelly's protestations."  Mem., Doc. No. 77, at 17 n.4.  In particular, the Court questioned whether Mr. Delaney's statements would be admissible under the hearsay rule or the parol evidence rule.  *Id.*

CCC now argues that such skepticism was clear legal error.  As to hearsay, CCC points to Mr. Delaney's position as the most senior WHJV representative on the Project as evidence that his statement qualifies as that of an opposing party under Rule 801(d)(2) of the Federal Rules of Evidence.  As to parol evidence, CCC argues that the parol evidence rule allows "clear, precise, and convincing evidence to show that the party who seeks to enforce the written agreement according to its tenor has admitted and acknowledged that the agreement as written did not express what the parties intended and that what the parties intended was omitted from the written agreement."  *Coal Operators Cas. Co. v. Charles T. Easterby & Co.,* 269 A.2d 671, 673 (Pa. 1970).

WHJV has not responded to these arguments, perhaps sensing their unimportance to the big picture.  Without evaluating the merits of these arguments, the Court rests on the final paragraph of the contested footnote:

> In any event, even if CCC could clear these three potential hurdles, the Court finds that CCC still clearly and unambiguously waived its claims against WHJV by signing the releases and change orders.  Given all of this, as well as Ms. Connelly's stated experience in the construction industry, her at-trial arguments that

she ignored all of that in the face of a virtual stranger's supposed invitation to "trust me" is simply not persuasive.

Mem., Doc. No. 77, at 17 n.4.

**ALTERNATIVE ARGUMENT: REVIVAL OF TWO CHANGE ORDER CLAIMS**

CCC argues, in the alternative, that the Court should revive CCC's claims under Change Order 1 and Change Order 7. The two change orders are addressed in turn.

## I. Change Order 1

The prior Memorandum recounted the negotiations around Change Order 1. *See* Mem., Doc. No. 77, at 8. In brief, the final dollar amount paid to CCC under the change order was roughly $500,000 less that Ms. Connelly had initially requested:

> Ms. Connelly was unhappy about the approximately $500,000 difference between what CCC had requested and what CCC had agreed to, and therefore requested that WHJV agree to replace the broad release language in the original draft of CO1 with language that she drafted. Tr. Day 1 (Connelly) at 51:14–19. Ms. Connelly proposed the new language that she thought would preserve Connelly's right to pursue the $500,000 difference between CCC's original proposed price and the final negotiated price. *Id.* at 52:5–14. . . .
>
> Ms. Connelly alleges that during the negotiation of CO1, in response to her complaint about the $500,000 difference between what she had requested and what she thought she had agreed to, Patrick Delaney told her to "trust [him]" and that he assured her that "you will be made whole at the end of the job." *Id.* at 91:5–11. The circumstances of the conversation, as related at trial by Ms. Connelly, are best understood [by the factfinder] as meaning that Mr. Delaney's alleged statement was limited to the context of the negotiations for the price of CO1. *Id.* at 91:5–11. Nothing in Ms. Connelly's testimony suggested that she thought the conversation, as she recounted it, related to anything other than her displeasure with the final negotiated amount of CO1. *Id.* at 90:1–18; 91:5–11.

*Id.*

CCC now argues that Ms. Connelly's conversation with Mr. Delaney preserved CCC's ability to pursue the extra $500,000 that it wishes had been included in the price of CO1.

The Court is unmoved from its original conclusion on this point. It remains unclear to the Court why a sophisticated, experienced businesswoman like Ms. Connelly would put more stock in Mr. Delaney's promises than in the plain language of a change order negotiated at arm's length.

## II. Change Order 7

As the Court explained, Change Order 7 was never executed because Ms. Connelly intended to assert a claim against WHJV and "understood that the proposed language — which was identical to the language in Change Orders 3 through 6 — would waive CCC's right to assert a claim." Mem., Doc. No. 77, at 10.

CCC seems to believe that the Court's prior Memorandum was broad enough to reach CO7. Given that CO7 was never executed, the Memorandum did not affect it. The Memorandum was cabined to apply to every change order except for CO7. *E.g.*, Mem., Doc. No. 77, at 17 ("The language of the change orders is likewise clear and unambiguous and releases all of CCC's claims accruing as of the date of each of Change Orders *3 through 6*.") (emphasis added). For its part, WHJV does not dispute the work or the pricing giving rise to CCC's claim. The parties simply never resolved their dispute, and CCC refused to sign CO7, so the change order was never formalized. WHJV has asserted that it is ready to pay once CCC executes a waiver.

### ANALYSIS OF THE MOTION FOR INTERLOCUTORY APPEAL

In the event its motion for reconsideration is denied, CCC has also moved for interlocutory appeal.

CCC must show that the issue for appeal (1) involves a "controlling question of law;" (2) for which there is "substantial ground for difference of opinion;" and (3) which may "materially

advance the ultimate termination of the litigation" if appealed immediately. *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir. 1974); *see also* 28 U.S.C. § 1292(b).

**Controlling Question of Law.** A "'controlling question of law' is one in which either: (1) if decided erroneously, would lead to reversal on appeal; or (2) is 'serious to the conduct of the litigation either practically or legally.'" *Knipe v. SmithKline Beecham*, 583 F. Supp. 2d 553, 599 (E.D. Pa. 2008) (quoting *Katz,* 496 F.2d at 755). In this case, the Court's prior Memorandum rested on factfinding and evaluation of witness credibility. Section 1292(b) "is not designed for review of factual matters." *Link v. Mercedes-Benz of North American, Inc.*, 550 F.2d 860, 863 (3d Cir. 1977). Therefore, there is no controlling question of law.

**Substantial Ground for Difference of Opinion.** "Substantial grounds for difference of opinion exist where there is genuine doubt or conflicting precedent as to the correct legal standard." *Bradburn Parent Teacher Store, Inc. v. 3M,* No. 02-CV-7676, 2005 WL 1819969, at *4 (E.D. Pa. Aug. 2, 2005). CCC argues that the substantial ground for difference of opinion arises from disagreements over "whether, when, and how to weigh evidence of the parties' course of conduct when there is a written contract." To the contrary: questions about the weight of evidence are for the factfinder. Therefore, there is no substantial ground for difference of opinion.

**Advance the Termination of the Litigation.** "Several factors are pertinent in determining whether an immediate appeal would materially advance the ultimate termination of the litigation, including: (1) whether the need for trial would be eliminated; (2) whether the trial would be simplified by the elimination of complex issues; and (3) whether discovery could be conducted more expeditiously and at less expense to the parties." *Knipe*, 583 F. Supp. 2d at 600 (quotations omitted). In this case, an appeal would not eliminate trial, simplify trial, or trim

discovery.  Discovery is complete and trial has already taken place on the issue presented for appeal.  Therefore, an appeal would not advance the termination of the litigation.

## CONCLUSION

For the foregoing reasons, the motion for reconsideration, or alternatively for leave to file an interlocutory appeal, is denied.  An appropriate order follows.


BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE